ARTHUR HUTCHINSON, JR. *v.* STATE OF
MARYLAND

[No. 76, September Term, 1977.]

*Decided December 7, 1977.*

The cause was argued before MENCHINE, MASON and LISS, JJ.

*Reginald W. Bours, III, Assigned Public Defender,* for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Steven A. Shaw, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

MENCHINE, J., delivered the opinion of the Court.

At about 7:30 p.m. on March 3, 1976, Jerome Roy Spencer was shot to death in the hallway of a Silver Spring, Maryland motel in which he had been a guest.

*At about 8:04 p.m. on the same date* Officer Malinowski, *a member of the Tactical Squad of the Montgomery County*

*Police Department, arrested Arthur Hutchinson* at 3rd and D Streets, N. E. *in Washington, District of Columbia,* for the homicide.

Hutchinson was convicted and sentenced for felony murder and use of a handgun in the commission of a felony after a bench trial in the Circuit Court for Montgomery County. In the same trial he was acquitted for attempted robbery.

In this appeal he contends, *inter alia,* that his confession was improperly admitted in evidence.

Hutchinson testified that, while alone with a District of Columbia police officer immediately prior to the interrogation by Montgomery County police that led to the confession, the following colloquy occurred:

> "Q I think you were talking about this D. C. detective. What else happened, if anything?
>
> A He got to asking me questions. I told him that I didn't want to talk, you know. And he took, he pulled the gun down from his holster, the holster comes down, and he sat it over on the table, first. It was — there was already a gun on another table. So he says something real smart to me.
>
> Q Can you tell the Court what you mean by that? What did he say?
>
> A I cannot actually recall what he said, but I sort of responded, because I was upset. And he told me, don't I know he can blow my F"ing head off and say I tried to grab his gun? And he picked the gun up and put it towards my face for a minute. And it upset me very much. So I just started to talk to him, you know. And he told me that he could help me with the Maryland police officer."

There was no evidence offered by the State specifically to rebut the above allegations.

In such circumstances the issue is controlled by *Gill v.*

*State,* 265 Md. 350, 289 A. 2d 575 (1972) and by *Streams v. State,* 238 Md. 278, 208 A. 2d 614 (1965).

In *Gill, supra,* it was said at 353-54 [577]:

"... But when it is contended that someone employed coercive tactics to obtain inculpatory statements, the charge must be rebutted. Here it is claimed the inducement occurred while Gill was alone with Hyson. Since it is uncontradicted that the suspect was in fact in the sole presence of this police interrogator, that specific person must rebut the allegations of coercion as no one else is qualified to do so."

In *Streams, supra,* it was said at 283 [616]:

"We think the State's failure, after Streams left the stand, to go forward with testimony which would refute his claim of promises and threats and to show the conduct of the police during the period he was in custody of the arresting officers was enough under the circumstances of this case to require a holding that the judgments appealed from must be reversed because the State did not meet its burden of establishing the voluntariness of the confessions as a prerequisite to their admission in evidence."

The proximity in time of the alleged threat and inducement to the interrogation that produced the confession was such as forbids a conclusion that their taint may have been neutralized by a repetition of *Miranda* warnings; by the passage of time; or by other circumstances tending to attenuate them. *Compare Jenkins v. State,* 25 Md. App. 551, 555, 334 A. 2d 549, 552 (1975).

In these circumstances we must reverse and remand for a new trial.

Additionally, the appellant has raised the following questions:

1. Was there probable cause for the arrest of the appellant?

2. Was the arrest of the appellant in the District of Columbia by a Montgomery County Police Officer lawful?

3. Was the search of the motor vehicle in which appellant was a passenger constitutionally infirm?

4. Was the evidence legally sufficient to convict for felony murder?

Because it is reasonable to believe that these other contentions will be raised at retrial, we shall answer them in this appeal.

### Probable Cause

In *Collins v. State,* 17 Md. App. 376, 383, 302 A. 2d 693, 697 (1973), we said:

"It is the existence of probable cause at the time of the arrest which is the measure of the legality of the arrest."

We added at 384 [697-98]:

"The rule of probable cause is a non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction, but more evidence than that which would arouse mere suspicion. *Cuffia v. State,* 14 Md. App. 521. Probable cause exists when the facts and circumstances within the knowledge of the arresting officer or the police team, or of which they had reasonably trustworthy information, are sufficient to warrant a reasonably cautious man in believing that a crime had been committed by the person arrested. Only the probability, and not a *prima facie* showing of criminal activity, is the standard for probable cause."

Officer Malinowski, assigned to plainclothes duty, was using a nondescript, unmarked vehicle equipped with two

separate radio transmitters-receivers by which he could communicate: (a) with other members of the Tactical Squad; and (b) with the Emergency Operations Center of the Montgomery County Police (EOC). His assignment required him to maintain a general surveillance of the business section of Silver Spring, Maryland, near the District of Columbia line, a "high crime area."

At about 7:35 p.m. on March 3, 1976, Malinowski parked his vehicle in an alley near the Quality Inn and turned off his lights. About one minute later he observed two men running from the motel at a fast rate of speed. Both turned to look behind them three or four times as they ran to a parked automobile that was attended by a third man. One entered the rear seat; the other the front of the parked vehicle. The vehicle pulled away at once — before the passenger door was closed.

Suspicion aroused, Malinowski followed the vehicle in Maryland for three-tenths of a mile to the District of Columbia line and continued to follow it into the District. At the outset Malinowski had requested Corporal Isaacs of the Tactical Squad to check the motel area. Isaacs did so.

At or about the same time, an employee of the motel by telephone advised EOC that an unconscious man was lying in the hallway of the motel with "blood all over." EOC broadcast a general alert. Car 305, operated by a supervisor of Malinowski, proceeded to the motel in response to that alert.

Corporal Isaacs, having observed that a motel guest had been shot and killed, broadcast the message, "It looks like its a 0100 series." He directed Malinowski to "stay with the vehicle."

The supervisor in Car 305, separately having confirmed the shooting death at the motel, broadcast the message, "Its a 0100 series and tell him go stop that car in the District." This message was transmitted at 7:44 p.m.

Malinowski testified that he heard both messages prior to the arrest. He explained that, "I knew there was a murder

there. . . . [When] somebody says 0100 on the air, that means it is a murder."

There were, of course, many other radio communications [1] relating to the homicide, in the interval between Malinowski's first observations at about 7:35 p.m. and the arrest at 8:03 p.m. We are persuaded, however, that further embellishment would serve merely "to gild refined gold, to paint the lily, to throw perfume on the violet, to smooth the ice, or add another hue unto the rainbow." [2] Officer Malinowski had probable cause to believe, at the time of the arrest, that Hutchinson had committed a felony in Montgomery County, Maryland.

## Legality of Arrest

In *Berigan v. State*, 2 Md. App. 666, 236 A. 2d 743 (1967), then Chief Judge Murphy of this Court (now Chief Judge of the Court of Appeals) said at 668 [744]: "It is, of course, clear that the legality of appellant's arrest must be determined by applying the law of the District of Columbia, the jurisdiction in which it was made." We shall determine the validity of the subject arrest in accordance with that command.

## The Facts

At the time of *entry* into the District of Columbia, Malinowski had no intention to arrest Hutchinson or to stop the vehicle in which the latter was a passenger. He gave this explanation for his decision to arrest, "we can exclude any radio communications received by [me] in Maryland as a factor [in the arrest]. . . . at the time [I] made the arrest [it may be] safely assume[d] that the probable cause in [my] mind was a combination of what [I] had seen in Maryland,

---

1. Radio communication to and from EOC concerning the murder commenced at 7:40 p.m. with the telephoned message from the motel employee. Fourteen pages of transcripts of the communications that followed prior to arrest at 8:03 p.m. were entered in evidence. They included messages to and from District of Columbia Police that appellant's brief described as indicating that "apparently frantic efforts were taking place to coordinate the eventual stop with the District of Columbia police."
2. Shakespeare: King John Act IV Sc 2.

and what [I] had heard on [my] radio within the District of Columbia."

We have previously shown that Officer Malinowski had probable cause to believe, at the time of Hutchinson's arrest, that the latter had committed a felony in Montgomery County, Maryland. It is clear, however, that Malinowski did not have such probable cause at the time he *entered* the District of Columbia.

## The Law

Appellant contends that because Malinowski did not have probable cause to arrest Hutchinson at the time of *entry* into the District of Columbia, the information thereafter acquired *within* the District of Columbia cannot be considered in determining whether probable cause for the arrest existed. We reject the contention.

Both the District of Columbia and the State of Maryland have adopted the Uniform Act on Fresh Pursuit. The District Act, as codified in the District of Columbia Code (1973) reads in pertinent part as follows:

"§ 23-901. *Arrests in the District of Columbia by officers of other States*

Any member of a duly organized peace unit of any State (or county or municipality thereof) of the United States who enters the District of Columbia in fresh pursuit and continues within the District of Columbia in fresh pursuit of a person in order to arrest him on the ground that he is believed to have committed a felony in such State shall have the same authority to arrest and hold that person in custody as has any member of any duly organized peace unit of the District of Columbia to arrest and hold in custody a person on the ground that he is believed to have committed a felony in the District of Columbia. This section shall not be construed so as to make unlawful any arrest in the District of Columbia which would otherwise be lawful."

168

No doubt surrounds the intended legislative purpose. In The Council of State Governments, *The Handbook on Interstate Crime Control* (Rev. ed. 1966) at 119, it is said:

"The purpose of the Uniform Act on Interstate Fresh Pursuit is to prevent criminals from utilizing state lines to handicap our police in their apprehension. At the present time our most desperate criminals head straight across state lines after the commission of a crime, knowing that there is comparative safety beyond the border. For in the foreign state the pursuing officer from the state wherein the crime was committed is, in general, no longer an officer. This abnormality, so contrary to all justice and reason, is remedied in a simple manner by the Fresh Pursuit Act. Thereunder, the moment an officer in fresh pursuit of a criminal crosses a state line, the state he enters will authorize him to catch and arrest such criminal within its bounds. The statute grants this right only when the officer is in fresh pursuit of a criminal, that is, pursuit without unreasonable delay, by a member of a duly organized peace unit, and only in cases of felonies or supposed felonies occurring outside the boundaries of the state adopting the act. It is thus based upon the little-known common-law doctrine of fresh pursuit, from which the statute has derived its name."

Was this statute intended to make the knowledge possessed by the officer upon *entry* into the District a touchstone solely determinative of the validity of an arrest made under it? We think not.

Was the statute intended to blind the eye and stop the ear of an officer who *entered* the District under its authority? We think not.

The circumstances in *State v. Tillman*, 208 Kan. 954, 494 P. 2d 1178 (1972), closely parallel the subject case. Both Kansas and Missouri had enacted the Uniform Law on Fresh

Pursuit. In *Tillman*, as here, the arresting officers *entered* the foreign State without probable cause to arrest. In *Tillman*, as here, a missing factor essential to probable cause was supplied by knowledge gained in the foreign State. The Supreme Court of Kansas, sustaining the validity of the arrest, said at 1182:

> "In the case at bar the robbers fled from the scene of the robbery in Kansas City, Kansas, to Kansas City, Missouri, where they were apprehended 90 minutes later. The pursuit was continuous, uninterrupted and without unreasonable delay. It was a 'fresh pursuit'; hence the arrest of the appellants by the Kansas police officers in Missouri was a valid arrest since the police had actual knowledge that the robbery had been committed and since the appellants were identified [in Missouri] as the robbers by Craig (Moon) Davis prior to their arrest at Southtown Motors."

*Commonwealth v. Robb*, 238 Pa. Super, 62, 352 A. 2d 515 (1975) involved the interpretation of an *Intrastate* fresh pursuit statute. The statute, differing but slightly from the interstate model act, reads as follows:

> " 'Any police officer in the employ of a county, city, borough, town or township may arrest, with or without a warrant, any felon or person who has committed a misdemeanor or summary offense beyond the territorial limits of the political subdivision employing such officer for such offense committed by the offender within the political subdivision employing the police officer if such officer continues in pursuit of the offender after commission of the offense: Provided, however, that a police officer shall exercise only the power of arrest that he would have if he were acting within the territorial limits of the political subdivision employing him.' " 352 A. 2d at 516.

In *Robb* the appellant made, *inter alia*, the following contention:

"Because the probable cause to arrest appellee did not become apparent to Officer Simes until they had left Montgomery County, and the proviso to 19 P.S. § 11, *supra*, permitted Officer Simes to exercise only the power of arrest that he had in Montgomery County, the officer did not have authority to make the arrest in Bucks County." 352 A. 2d at 517.

The Court, rejecting the contention, said:

"Our disagreement with appellee arises primarily from his interpretation of 19 P.S. § 11, in prong (3). Under the statute, without considering the proviso, there can be no doubt that Officer Simes was authorized to arrest appellee. The statute authorizes police officers to pursue summary offenders, misdemeanants, and felons across township lines and to arrest them. The question then becomes whether the language of the proviso means that, because the probable cause to arrest appellee did not become apparent until after the officer and appellee had crossed the border, the officer had no authority to arrest appellee.

. . . .

"One final observation is pertinent: if appellee's interpretation of the statute were to be accepted, then the amendments to the statute must necessarily fail of their essential purpose. The purpose of the amendments was to authorize township police officers to pursue intoxicated automobile operators across township lines, and to arrest them. Appellee contends that the statute does not authorize such an arrest unless probable cause becomes apparent before the officer crosses the township line. Such an interpretation would give the statute a very narrow scope of operation

when applied to driving-while-intoxicated cases, contrary to the legislative purpose." (Footnote omitted.) 352 A. 2d at 517-18.

In yet another opinion dealing with the Pennsylvania *intrastate* fresh pursuit act, the Court in *United States v. Getz,* 381 F. Supp. 43 (E.D. Pa. 1974), *aff'd without opinion* 510 F. 2d 971 (3rd Cir.), *cert. denied,* 421 U. S. 950 (1975), gave recognition, on the probable cause issue, to knowledge gained by pursuing officers after entry into the foreign political subdivision.

In *Boddie and Brooks v. State,* 6 Md. App. 523, 531, 252 A. 2d 290, 294 (1969), Chief Judge Murphy of this Court (now Chief Judge of the Court of Appeals) said:

"Under the Uniform Act on Fresh Pursuit of the District of Columbia, a Maryland peace officer is authorized to enter the District while in fresh pursuit to effect an arrest where there is reasonable grounds to believe that the person to be arrested has committed a felony in Maryland. In so acting, the Maryland police officer is vested by Section [901] with the same authority to arrest and hold such person in custody as a police officer of the District of Columbia would have to make an arrest of a person believed to have committed a felony in the District. In this connection, we note that the law of Maryland and that of the District are virtually identical with respect to the authority of a peace officer to make a warrantless arrest for a felony. Compare *Davis v. United States,* 230 A. 2d 485, *Curtis v. United States,* 222 A. 2d 840, and *Townsley v. United States,* 215 A. 2d 482 (District of Columbia Court of Appeals) with *Robinson v. State,* 4 Md. App. 515."

Chief Judge Murphy added at 532 [295]: "And it is settled that the legality of an arrest is measured by the existence of probable cause *at the time of the arrest."* (Emphasis in original.) While *Boddie and Brooks* did not involve the precise question now directly before us, the cited language

indicates quite strongly that the Uniform Act on Fresh Pursuit should not be so narrowly construed as to alter the firmly fixed rule of law that the existence of probable cause at the time of an arrest should be the measure of its validity. We think that the statute intended no such alteration.

Accordingly, we hold that the statute was intended to permit any member of an organized peace unit of any State to *enter* in fresh pursuit; to *continue* in fresh pursuit within the District; and *to arrest the person pursued, whom he has probable cause to believe, at the time of arrest, committed a felony in the place of the officer's jurisdiction.*

## Legality of the Search

Immediately following the arrest, Officer Malinowski had observed a handgun and bullets in the back seat of the vehicle in which Hutchinson had been seated. He did not, however, seize them at that time. Instead, the vehicle was towed to the Montgomery County impoundment lot. At the later point the gun and bullets were seized. The items were ultimately placed in evidence at the trial.

Appellant contends that the warrantless subsequent search of the car at the Montgomery County impoundment lot and the seizure at that time of the gun and bullets was constitutionally infirm. He argues that the items should have been suppressed as evidence. We find the appellant's contention without merit on two separate grounds.

First, a search of the car was justified in that under the exigent circumstances at the time of the arrest, Officer Malinowski had probable cause to believe the car contained an instrumentality of the crime. *Chambers v. Maroney,* 399 U.S. 42, 90 S. Ct. 1975, 26 L.Ed.2d 419 (1969).

In *Chambers, supra,* the Supreme Court noted that it as insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution. The Supreme Court stressed that as a general rule the judgment of a magistrate on the probable cause issue and the issuance of a warrant before the search is requisite but nonetheless declared that probable cause, without a warrant, will serve

as sufficient authorization for a search under exigent circumstances, saying:

> "Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.' But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." 399 U. S. at 51-52, 90 S. Ct. at 1981, 26 L.Ed.2d at 428.

Thus, it is plain that a search would have been legal at the place of arrest.

The subsequent search by the Montgomery County Police at the impoundment lot in Montgomery County did not render it constitutionally infirm. On this point *Chambers v. Maroney, supra,* is dispositive. There, as here, the Supreme Court was faced with the issue of the effect of a deferred search and seizure. The Court commenced its opinion with the following:

> "The principal question in this case concerns the admissibility of evidence seized from an automobile, in which petitioner was riding at the time of his arrest, after the automobile was taken to a police station and was there thoroughly searched without a warrant." 399 U. S. at 43, 90 S. Ct. at 1977, 26 L.Ed.2d at 424.

The Court answered that question by sustaining the trial court's admission into evidence of the items seized in the deferred search.

Accordingly, no unreasonable search and seizure has been demonstrated. The disputed evidence was properly admitted at trial.

Second, in a very real sense, *there was no search.* Officer Malinowski testified that he saw the gun in the back seat of the car at the time of arrest. This sighting of the gun in plain view would have entitled the officer to seize the weapon forthwith. As then Chief Judge Murphy of this Court (now Chief Judge of the Court of Appeals) said in *Sweeting v. State,* 5 Md. App. 623, 627, 249 A. 2d 195, 198 (1969):

> "It has been held under circumstances not dissimilar to those involved in the present case that where an officer is in a place where he is lawfully entitled to be (as here, on a public street), the shining of a flashlight at night inside the vehicle while remaining outside does not amount to an illegal search under the Fourth Amendment." (Citations omitted.)

Thus, under the plain view rule, under circumstances where there was probable cause to believe that the observed weapon had been used in the murder, it was subject to seizure without search. Under the *Chambers* rationale, the fact that the weapon was not physically seized until later is without significance. *See Bailey v. State,* 16 Md. App. 83, 108, 294 A. 2d 123, 137 (1972).

### *Sufficiency*

Because the case must be remanded for a new trial by reason of error relating to the admissibility of evidence, we shall say no more than that the evidence in the present record was legally sufficient to convict of felony murder.

> *Judgments reversed.*
> *Case remanded for a new trial.*
> *Costs to be paid by Montgomery County.*