784 A.2d 670

**Bion JACKSON**

v.

**STATE of Maryland.**

**No. 3023, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Nov. 5, 2001.

Argued Brian J. Murphy, Assigned Public Defender (Steven E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Steven L. Holcomb, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Patricia Jessamy, State's Atty. for Baltimore City, on the brief), Baltimore, for Appellee.

Argued before DAVIS, SALMON, and DEBORAH S. EYLER, JJ.

DEBORAH S. EYLER, J.

A jury in the Circuit Court for Baltimore City convicted Bion Jackson, the appellant, of two counts each of first degree burglary, robbery, second degree assault, and misdemeanor theft, and one count of felony theft. The court sentenced the appellant to two 15–year consecutive sentences on the first degree burglary convictions, two 15–year concurrent sentences on the robbery convictions, and a 10–year consecutive sentence on the felony theft conviction. Sentences on the other convictions were merged.

The appellant presents two questions on appeal, which we have rephrased:

I. Did the motion court err in ruling his confession admissible?

II. Did the sentencing court err in imposing sentences for robbery and felony theft?

For the following reasons, we answer the first question "no" and the second question "yes." Accordingly, we shall affirm the appellant's convictions but vacate his sentence for felony theft.

## FACTS AND PROCEEDINGS

On the afternoon of March 15, 2000, the appellant went to an apartment complex in the 4300 block of North Charles Street, in Baltimore City, and tricked Francis Meginnis, an elderly woman, into opening her apartment door. He forced his way inside Meginnis's apartment and demanded money and "diamonds." Meginnis gave the appellant about $100 and her ATM card. The appellant then forced Meginnis to call her neighbor, Paul Pannella, and lure him to her apartment under a pretext. When Pannella arrived, the appellant confronted him, took $40 and his credit card, and forced him and Meginnis into a bedroom, where he tied them up with telephone cord. The appellant took Pannella's keys, went to Pannella's apartment, and took $600. Finally, the appellant used Pannella's keys to steal Pannella's 1997 BMW automobile.

When Meginnis and Pannella managed to free themselves, they called the police, who launched an investigation. The next day, March 16, 2000, the appellant called Pannella's home telephone number and left a voice-mail message saying he would call back about the BMW. Pannella told the police of this and several officers came to his apartment. They were present when the appellant called back and demanded that Pannella pay "seven or eight hundred" dollars for the return of his car. Pannella offered to pay $200. The appellant

agreed, and told Pannella to meet him in front of The Johns Hopkins Hospital Emergency Room to make the exchange.

A police officer posing as a taxicab driver drove Pannella to the Hopkins Emergency Room. When the appellant called out to Pannella and approached him, the police arrested him.

The appellant was transported to the Northern District Police Station. Upon being questioned by Detective Thomas Wolf, the appellant gave a written statement in which he admitted committing the crimes and then arranging to meet Pannella at the Hopkins Emergency Room. In his statement, the appellant said that a man named "Hugo" had taken him to Meginnis's apartment and, after the robbery, "Hugo" had driven the appellant home in Pannella's car and had kept the car, after giving the appellant some money and heroin.

Pannella's BMW was recovered seven days after the appellant was arrested, in the 1100 block of North Wolf Street, in Baltimore City.

Additional facts will be given in our discussion of the issues.

## DISCUSSION

### I.

Before trial, the appellant moved to suppress his written inculpatory statement to the police on the ground that it was not freely and voluntarily made. The court held a suppression hearing at which the State called Detective Wolf as the sole witness in its case-in-chief.

Detective Wolf testified that he arrested the appellant in front of the Hopkins Emergency Room sometime between 6:30 p.m. and 8:00 p.m. on March 16, 2000. He next had contact with the appellant at 9:05 p.m., at the Northern District Police Station. In the interim, Detective Wolf was driving Pannella home and the appellant was being transported to the Northern District Police Station and being held there until Detective Wolf returned.

According to Detective Wolf, the appellant was in police custody for "probably an hour and a half" before he and his

partner, Detective Myra Sexton, returned to the station house. During that time, the appellant was kept in Detective Wolf's office, and was handcuffed. Also during that time, other police officers may have had contact with the appellant. An activity log was not kept because it was not standard practice to do so except in homicide and rape cases.

Detectives Wolf and Sexton together interviewed the appellant and took his written statement. At the outset of the interview, Detective Wolf read the appellant his *Miranda* warnings.[1] The entire interview lasted about 20 minutes. Detective Wolf testified that no police officers threatened or physically abused the appellant or "offer[ed] him anything" to prompt a statement from him. After the appellant gave his statement, he was transported to Central Booking.

The appellant then testified. He said he was transported to the Northern District Police Station in a paddy wagon and was placed in a room alone for about an hour. A man then entered the room. He was wearing a name tag, but the appellant could not remember his name. When asked to describe the man, the appellant said he was "kind of tall." The man was not in a uniform. The appellant thought the man was a sergeant, however, because one of the officers present at the Emergency Room had commented that they were waiting for a sergeant to arrive. The appellant did not say whether he had seen the tall man at the hospital, however.

According to the appellant, the tall man asked him his name, and said, "Where's the car at?" The appellant replied, "Man, I'm high right now." The tall man then "choked him" with both hands and demanded that he say "where the car [was] located." The tall man left the room to do a computer check on the appellant's name. When he returned, he was with a "black female" and "another black guy."[2] The appel-

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. This phrase suggests that the "tall man" was African–American; the appellant never gave his race, however.

lant did not identify these people or describe them in any greater detail than that. All three people demanded to know where the "ATM cards," "BMW car," and "money" were, threatened to charge the appellant with Meginnis's murder,[3] and then "bum wrestled," "beat[ ]," "chok[ed]," and "hit[ ]" the appellant, using "[f]ists, cuffs, the chair that was in there, everything." The appellant vomited during the beating. Afterward, he was "bruised up, bleeding, busted open." He had been "cut up," and had "busted lips, swollen eyes, head."

The appellant further testified that about 15 minutes elapsed between the beating and the start of the interview by Detective Wolf. When Detective Wolf came in the room and started the interview, the appellant's injuries were present. In fact, the appellant was still "bruised up, bleeding, [and] busted open" after the interview, when he was taken to Central Booking. The appellant described the interview as being 3½ hours long. He also said the "female officer and the black guy" both were present during the interview.[4] The appellant claimed he was high on heroin when he was interviewed. He reviewed his written statement and testified that even though his initials appear on it, he did not remember telling Detective Wolf most of the information in it. The appellant further testified that three days after the interview he was taken to a hospital for treatment.

On rebuttal, the State re-called Detective Wolf. It did not call any other witnesses. Detective Wolf testified that when he first saw the appellant at the station house, the appellant appeared "normal. He wasn't agitated and he appeared to be pretty much the same when I left him from the arrest scene." Detective Wolf did not see any injuries or marks on the appellant, and the appellant did not seem to be under the influence of drugs or alcohol.

---

**3.** Meginnis was not killed in the incident.

**4.** This phrase suggests that the "tall man" was white. Again, the appellant never stated his race.

Detective Wolf identified a photograph taken of the appellant after the interview, at Central Booking, "probably after midnight" on March 17, 2000. The photograph, which was taken as a routine part of the booking process, is a close-up shot of the appellant's head and face. It shows no signs of injury.

Detective Wolf testified that, in his experience, Central Booking will not accept for intake a prisoner with injuries or one who is "intoxicated over a level they think is unsafe" or has "any unusual psychological problems." Instead, police policy requires that such a prisoner immediately be transported to Mercy Medical Center for evaluation by a doctor. Only after medical clearance will Central Booking accept the prisoner. In this case, Detective Wolf explained, the appellant was *not* taken to the hospital for clearance and *was* accepted by Central Booking—both of which were inconsistent with his having sustained any injuries.

At the end of the State's rebuttal case, neither the prosecutor nor defense counsel made arguments to the court; instead, they both said they were "submit[ting] on the evidence." The court denied the appellant's motion to suppress, without comment. The case then went to trial.[5]

The appellant's written statement was admitted into evidence in the State's case, through Detective Wolf. In the defense case, the appellant testified that he was physically abused by four police officers (not three) before Detective Wolf interviewed him. First, a man he thought was a sergeant choked him while he was handcuffed to a chair. He then left and "three more officers" came in, questioned him, "choked" him, "hit" him, threw him out of the chair, made him vomit, and told him to clean up the vomit.

And the guy, Officer Wolf, he was asking me am I going to make a statement. I made the statement to prevent them from choking me and beating me up.

---

5. Immediately before the start of trial, the appellant was permitted to discharge his public defender and represent himself; the court ordered the public defender to attend the trial as "standby counsel," however.

I was getting tired. I was already under the influence because I done did three bags of dope already, so I'm tired of them punching me in my stomach so I said, "Yeah I did it," so they would leave me alone. The questions on that statement, I didn't even read the questions or nothing like that. I just signed my name right there saying I did it.

The appellant contends the circuit court erred in ruling his confession admissible because the State's evidence was legally insufficient to "rebut the specific allegations of coercive mistreatment" by the police that he claims rendered his confession involuntary. Specifically, the appellant argues that because Detective Wolf acknowledged, in the State's case, that there was a period of time when he (the appellant) was at the station house and other officers may have had contact with him, it was incumbent upon the State to call the officers who allegedly abused him, or some combination of them, or to call others who had custody of him from the time he arrived at the station house until Detective Wolf arrived and began the interview, to counter his testimony. He maintains that under the circumstances, Detective Wolf's rebuttal testimony and the booking photograph were insufficient, as a matter of law, to refute his testimony about physical abuse. In advancing this argument, the appellant relies on *Mercer v. State*, 237 Md. 479, 206 A.2d 797 (1965); *Streams v. State*, 238 Md. 278, 208 A.2d 614 (1965); *Gill v. State*, 265 Md. 350, 289 A.2d 575 (1972); and *Hutchinson v. State*, 38 Md.App. 160, 380 A.2d 232 (1977).

The State responds that this issue was not preserved and lacks merit in any event. It argues that, in deciding the threshold question of voluntariness of a defendant's confession or incriminating statement, the court may consider the totality of the evidence. In this case, the court did so, and properly concluded, based on the total evidence, that the State had met its burden of proving voluntariness, notwithstanding that the unidentified officers were not brought in to testify on rebuttal. The State also argues that any error by the court in this regard was harmless.

 In Maryland, a defendant's confession is admissible in evidence against him if it is:

(1) voluntary under Maryland nonconstitutional law,

(2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights, and

(3) elicited in conformance with the mandates of *Miranda* [*v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ].

*Winder v. State*, 362 Md. 275, 305–06, 765 A.2d 97 (2001) (footnote omitted) (citing *Ball v. State*, 347 Md. 156, 173–74, 699 A.2d 1170 (1997); *Burch v. State*, 346 Md. 253, 265, 696 A.2d 443 (1997); *Hof v. State*, 337 Md. 581, 597–98, 655 A.2d 370 (1995); and *Hoey v. State*, 311 Md. 473, 480, 536 A.2d 622 (1988)). Voluntariness under Maryland nonconstitutional (*i.e.*, common law) means that the incriminating remark must be "shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary." *Hillard v. State*, 286 Md. 145, 150, 406 A.2d 415 (1979). The state common law standard, "[i]n plain English, ... means that, 'under the totality of all the attendant circumstances, the statement was given freely and voluntarily.'... The 'totality of the circumstances' test also governs the analysis of voluntariness under the State and Federal Constitutional provisions." *Burch v. State, supra*, 346 Md. at 266, 696 A.2d 443 (quoting *Gilliam v. State*, 320 Md. 637, 650, 579 A.2d 744 (1990)).

 The State bears the burden of showing that the defendant's confession was his free and voluntary act, and was "not a product of force, threats, or inducement by way of promise or advantage." *Parker v. State*, 225 Md. 288, 291, 170 A.2d 210 (1961). Voluntariness of a defendant's confession must be established in a two-tier approach. First, the trial court must rule on the admissibility of the defendant's confession, that is, whether it passes constitutional and state common law muster, and comports with the requirements of

*Miranda v. Arizona. Hof v. State, supra,* 337 Md. at 604, 655 A.2d 370; *Bagley v. State,* 232 Md. 86, 92–93, 192 A.2d 53 (1963). At that juncture, the State must prove the voluntariness of the confession by a preponderance of the evidence. *Winder, supra,* 362 Md. at 306, 765 A.2d 97. Once the court has ruled the confession admissible, the issue of its voluntariness, if generated at trial, "becomes a question for the jury to decide in the light of all the facts and circumstances of the case," *Bagley, supra,* 232 Md. at 93, 192 A.2d 53, and must be proven by the State beyond a reasonable doubt. *Winder, supra,* 362 Md. at 306, 765 A.2d 97.

 In reviewing the motion court's threshold ruling on whether the defendant's inculpatory statement was voluntarily given and hence is admissible, we consider only the evidence adduced at the suppression hearing. *Pappaconstantinou v. State,* 118 Md.App. 668, 670, 703 A.2d 1295 (1998). We defer to the motion court's first-level factual findings and its witness credibility determinations. *Id.* We will not disturb the motion court's ruling on admissibility "unless there was a clear abuse of discretion." *Murphy v. State,* 8 Md.App. 430, 435, 260 A.2d 357 (1970) (footnote omitted). We make our independent appraisal of the legal significance of the motion court's factual findings, however. *Pappaconstantinou,* 118 Md.App. at 670, 703 A.2d 1295. Finally, we review decisions on questions of law *de novo.*

### (i)

The State maintains that because the appellant did not argue, at the conclusion of the suppression hearing, that the State's failure to specifically rebut his claims of police coercion meant that its evidence of voluntariness was legally insufficient, he failed to preserve the issue for appeal. It cites *Brashear v. State,* 90 Md.App. 709, 720, 603 A.2d 901, *cert. denied,* 327 Md. 523, 610 A.2d 796 (1992), in support. In that case, the defendant had moved to suppress certain evidence on Fourth Amendment grounds, arguing that one of two police officers who had entered his apartment and seized the evidence had had no right to enter the apartment at all. The

single contested issue at the suppression hearing was whether the appellant had given that officer consent to enter the apartment. The motion court ruled that consent had been given. On appeal, the defendant argued that that ruling was erroneous, and that the evidence should have been suppressed because the other police officer should have obtained a warrant. We reviewed the motion court's ruling on the issue of consent but declined to address the warrant issue, on the ground that it was not raised or decided below, and therefore was not preserved for review.

The instant case is not analogous to *Brashear* on the question of preservation. The particular Fourth Amendment argument raised for the first time on appeal in that case involved questions of fact on which no evidence had been presented and questions of law that were not addressed or decided below. Here, the single issue before the court was the voluntariness of the appellant's statement, and all of the evidence and the ruling of the court addressed and decided that issue.

Once the appellant moved to suppress his statement on the ground that it was coerced, thereby placing the burden of the State to prove the statement's voluntariness in an evidentiary hearing in which the court was the decision maker, the legal sufficiency of the State's evidence, like the legal sufficiency of the evidence to convict in a court trial, became a question of law inherent in the court's ruling. *Cf.* Md. Rule 8–131(c) ("in action tried without a jury, [t]he appellant court will review the case on both the law and the evidence"); *Williams v. State*, 5 Md.App. 450, 455–56, 247 A.2d 731 (1968) (holding that, in a case tried by the court, the appellate court may entertain the issue of sufficiency in the absence of a motion for judgment of acquittal, because the case shall be reviewed on the law and the evidence). In other words, in ruling on the suppression motion, the court necessarily had to decide whether the State's evidence of voluntariness was legally sufficient to permit the written statement to come into evidence. If the evidence was not sufficient, the

court was bound, in applying the law, to rule it inadmissible, regardless of whether the appellant articulated the precise reason why it was not sufficient. Thus, by raising the issue of voluntariness, the appellant preserved the question of the sufficiency of the State's evidence on that point.

### (ii)

The line of cases the appellant cites to support his argument that the State's evidence of voluntariness was insufficient to counter his evidence of police coercion predates *Mercer*, and includes *Jackson v. State*, 209 Md. 390, 121 A.2d 242 (1956), in which the State acknowledged that the defendant had been beaten by police officers two days before he gave a confession but argued that the confession was freely given because the defendant was calm and composed at the time. In rejecting that argument, the Court of Appeals remarked, in *dicta*, that in showing that a defendant's confession was not induced by force or other forms of coercion exercised by police officers, "[i]n practice, the State has almost invariably attempted to meet [its] burden by calling all persons who had the prisoner in charge." 209 Md. at 394, 121 A.2d 242. In *Bagley v. State*, 232 Md. 86, 192 A.2d 53 (1963), the Court clarified this comment, explaining that while the State "almost invariably" goes about proving the voluntariness of a confession by calling all the people who had charge of the defendant, that is not a "mandatory rule"; on the contrary, " '[to] compel all police personnel who ever viewed the defendant while in custody to testify about the voluntary nature of a confession is unreasonable and not required.' " *Bagley, supra*, 232 Md. at 94, 192 A.2d 53 (quoting *People v. Reader*, 26 Ill.2d 210, 186 N.E.2d 298, 302 (1962)).

The case the appellant relies on most heavily is *Mercer v. State, supra*, 237 Md. 479, 206 A.2d 797, decided the year before *Bagley*. In *Mercer*, the defendant was arrested on charges of housebreaking, larceny, and receiving goods and was taken to the police station, where he was questioned by a number of officers. Eventually, he made an oral confession. In a subsequent challenge to its voluntariness, he testified that

two of the interrogating officers, whom he identified by name, used physical force to induce him to confess, one by "smacking" him in the mouth and the other by grinding the heel of his shoe into his foot. The State did not call either of those officers to testify in rebuttal. Instead, it called a third officer, who had not been in the interrogation room the entire time and had left before the alleged abuse occurred. That officer testified that when he later returned to the interrogation room, right before the defendant made his confession, "he did not observe any bruises or marks" on the defendant. *Mercer, supra,* 237 Md. at 483, 206 A.2d 797.

The Court of Appeals held that the State's evidence was legally insufficient to prove the defendant's confession was voluntary, because the defendant's testimony about having been physically abused was "uncontradicted by either of the persons named." *Id.* at 484, 206 A.2d 797. The Court explained that the third officer's testimony about not having seen any bruises or marks on the defendant after the physical abuse allegedly was inflicted was not sufficient to rebut the defendant's testimony, given that the State did not call either of the officers who supposedly perpetrated the abuse.

In *Streams v. State, supra,* 238 Md. 278, 208 A.2d 614, the defendant sought to suppress two statements he had made while in police custody, on the ground that they were induced by threats and promises. The State called Sergeant Tabeling, who testified that three officers, including one officer whom he identified by name, had arrested the defendant at his home and taken him to the station house, where he was held for several hours. Later that day, Sergeant Tabeling questioned the defendant, and he confessed. Two days later, Sergeant Tabeling questioned the defendant again, and elicited a second confession. According to Sergeant Tabeling, he did all the questioning himself and no threats or promises were made to induce the confessions.

The defendant testified that when the three officers took him from his home, they promised he would be returned if he answered questions, and proceeded to interrogate him while

they were in transit to the police station. Once at the station house, Sergeant Tabeling and an Officer Butler both questioned him, and Officer Butler promised that if he made a statement they would try to get him probation; otherwise, they would "throw the book" at him and "get [him] more time." *Streams, supra,* 238 Md. at 281, 208 A.2d 614.

The State did not put on a rebuttal case.

The Court of Appeals held that the State's evidence was legally insufficient to prove voluntariness. It emphasized that the State did not contest that when the defendant was brought to the station house he was in the custody of three officers other than Sergeant Tabeling and Officer Butler, and that it did not call any of the three to rebut the defendant's testimony about the promise they had made, even though Sergeant Tabeling had disclosed the identity of one of those officers in the State's case. In addition, the State did not re-call Sergeant Tabeling or call Officer Butler to refute the defendant's testimony about the promises and threats allegedly made by them during the interrogation.

In *Gill v. State, supra,* 265 Md. 350, 289 A.2d 575, the defendant was taken into custody and charged with armed robbery and kidnaping. He was interrogated by two police officers, and gave a confession, which he later sought to suppress on the ground that it was coerced. Officer Corrigan, one of the two interrogating officers, testified for the State that the defendant was advised of his *Miranda* rights and signed a waiver, was interrogated, and then confessed voluntarily. The defendant testified that during the interrogation, at a point when he was alone with Officer Hyson (the other interrogating officer), Officer Hyson threatened to punch him in the face if he asked any more "smart questions." Officer Corrigan then came running into the room and threatened to arrest the appellant's girlfriend if he didn't confess; Officer Hyson also threatened to arrest the appellant's girlfriend.

On rebuttal, the State re-called Officer Corrigan, who generally refuted the defendant's allegations. The State did not call Officer Hyson, however. On appeal, the Court of Appeals

held that the State's evidence was legally insufficient to prove the voluntariness of the defendant's confession. It explained that because it was uncontradicted that the defendant had been alone with Officer Hyson, Officer Hyson had to be the person to rebut the allegations of coercion, "as no one else [was] qualified to do so." *Gill, supra,* 265 Md. at 353, 289 A.2d 575.

Finally, in *Hutchinson v. State,* 38 Md.App. 160, 380 A.2d 232, the defendant was apprehended in the District of Columbia, by a Montgomery County Police Officer, for a homicide that had been committed an hour before in Maryland. The defendant gave a confession to the Montgomery County police officer. He later challenged the confession, testifying that before the Montgomery County Police Officer questioned him, he had been alone in a room with a member of the District of Columbia Metropolitan Police. That officer made an implied threat by placing his gun on the table and commenting that he could shoot the defendant and then say the defendant had tried to grab the gun. The defendant testified that he was so upset by the threat that he started to talk. The State did not put on any evidence to rebut that testimony. The court admitted the confession into evidence.

This Court reversed the defendant's convictions, observing that the case was controlled by *Streams* and *Gill.*

In the case *sub judice,* the appellant argues that the four cases discussed above establish that when it is uncontroverted that the defendant was in the charge of an officer (or officers) before giving a confession, and the defendant has testified that that officer (or officers) used force, threats, or promises to induce his confession, the State cannot prove voluntariness without at least calling as a witness one officer who was present when the alleged threats or promises were made, or force applied. Thus, because it was uncontested in this case that for some period of time the appellant was in the station house but not in the charge of Detective Wolf, Detective Wolf's testimony, standing alone, was legally insufficient to rebut the allegations of coercion. In addition, the appellant

argues that *Mercer* establishes that when a defendant claims his confession was coerced by the use of physical force, voluntariness cannot be proven by the testimony of an officer who was not present when the abuse allegedly took place that the defendant did not thereafter have bruises or other physical marks consistent with the application of force.

We disagree with the appellant that considering the total circumstances in this case the State's evidence, in its case-in-chief and on rebuttal, was insufficient as a matter of law to prove the appellant's confession was made voluntarily. The cases discussed above are distinguishable from this case in several important respects.

In *Mercer, Streams,* and *Gill,* the identities of the offending officers were known but the State did not call them or anyone who had been with them at the relevant times. In *Mercer,* the defendant identified the officers he claimed used force against him by name; the State did not call them, however, and instead put on a third officer who had no pertinent firsthand knowledge. In *Streams,* one of the three arresting officers who allegedly made the promises to the defendant and was identified by Sergeant Tabeling in the State's case was not called to testify on rebuttal. Nor was Sergeant Tabeling recalled by the State to refute the defendant's allegations of coercion during the interrogation. In fact, the State did not put on any rebuttal case. In *Gill,* the defendant identified the officer who allegedly made threats against him, but the State did not call the officer to rebut the allegations. In all three of these cases, the State did not directly counter particularized allegations of improper threats and promises even though there appeared to be no impediment to its doing so.

In *Streams, Gill,* and *Hutchinson,* the alleged police misconduct consisted of the making of promises and threats, not the application of force. In those cases, there were no videotapes or recordings that could have established whether the promises or threats were made. The only means of proving or disproving whether threatening or promising words had been spoken was by the testimony of those to whom or by

whom the words were said or heard—or those who would have been in a position to have heard the words, if they were spoken. Thus, in *Streams* and *Gill,* the State not only failed to refute the appellant's specific allegations of misconduct by identified officers by calling the officers, it failed to do so under circumstances in which that was the only way to refute the allegations.

In *Hutchinson,* the defendant could not identify the Metropolitan Police Officer who allegedly threatened him with his gun. Because there was no way to refute the defendant's testimony, other than by calling the unidentified officer to testify, this Court was constrained to hold that in the absence of that officer's testimony voluntariness was not proven.

In the case at bar, unlike in *Streams, Gill,* and *Mercer,* the appellant did not identify the people he claimed were police officers who had physically abused him. His descriptions of them were vague and general. The first man was in plainclothes, but had a name tag that the appellant could not recall. The only physical trait the appellant offered when asked to describe that man was that he was "[k]ind of tall." It is impossible to tell from the appellant's testimony whether the man was black or white. The appellant described the other two people only as a black male and a black female. Although in *Hutchinson* the officer in question also was not identified, in that case the alleged misconduct was the making of a threat, which, as we have noted, only could be disproved by the officer himself. In this case, the alleged misconduct was the application of physical force that, in the appellant's own words, left him bruised and bleeding, with "busted lips, swollen eyes, head" that were plainly visible when Detective Wolf began questioning him, and still were visible when he was transported to Central Booking. This is unlike the situation in *Mercer,* moreover, where the application of force was not such as necessarily to have caused an apparent injury, and the defendant never claimed that it had.

In the instant case, the evidence presented by the State on rebuttal targeted and refuted the most specific, well-developed

aspects of the appellant's own testimony. The appellant emphasized that the alleged beating caused serious physical injuries to his face that were evident when he was interviewed and when he was booked. The State responded with a close-up photograph of the appellant's face that was taken at Central Booking, at the precise time that, according to the appellant, he was bruised, bleeding, and cut up. The photograph shows no injury to the appellant whatsoever. It is difficult to imagine more compelling demonstrative evidence than this to counter the appellant's claim of coercion. Detective Wolf's rebuttal testimony about the procedure at Central Booking for handling prisoners with injuries was additional evidence to contradict the pointed testimony the appellant had given.

Unlike the appellant's detailed and graphic description of his alleged injuries, his testimony about the three (later amended to four) police officers who allegedly beat him was too vague and non-specific to be readily countered by the State. Detective Wolf explained that there was no log kept about who might have encountered the appellant during the time he was waiting at the station house, and that it was not standard procedure to keep such a log. Thus, to have directly refuted the appellant's allegations in this regard, the State would have had to scour police personnel records to identify every male police officer and every African–American female police officer who had been at the Northern District station house when the appellant was awaiting Detective Wolf's arrival, and would have had to call all of them to testify.

The objective of the court in a suppression hearing on the issue of voluntariness of a confession is to determine whether it is more probable than not that the confession was voluntary, and not the product of coercive police tactics. In ruling on that issue, the court may consider all evidence that is competent and material to the question before it. As the early cases in the *Streams–Gill* line make plain, the law is not wedded to formulaic methods of proof in this regard. When a defendant has offered detailed, specific evidence about the

injuries he claims the alleged police coercion produced, evidence directly countering the existence of those injuries is highly probative of whether the alleged coercion took place, and hence whether the confession was produced by coercion. When the same defendant neither identifies nor describes with any specificity those he claims used the coercive tactics to gain a confession, it would not be reasonable to hold that the otherwise compelling proof by the State loses its evidentiary value merely because the State did not attack allegations so vague as to not lend themselves to direct rebuttal.

In this case, the court had before it Detective Wolf's testimony that the appellant was given his *Miranda* warnings; that no force, threats, or promises were made or used by the police to gain the appellant's confession; that the appellant did not have any injuries when the interview resulting in the confession occurred; and that the appellant went through the normal booking process, which would not have occurred if he had been injured as he claimed to have been. The court also had before it a photograph showing that, within a short period of time after the police interview, the appellant was uninjured, contrary to his own testimony. Considering the totality of the circumstances, this evidence was legally sufficient to prove that the confession was voluntary, and not the result of the use of physical force. If the appellant had identified with some degree of specificity the officers he alleged committed the physical abuse, it would have been preferable for the State to have called them too. That did not happen, however. The State was not required to track down and call to testify every male police officer and every and African–American female police officer present at the Northern District Police Station on the night in question in order to prove voluntariness.

## II.

The appellant also challenges the circuit court's failure to merge his sentence for felony theft of Pannella into his sentence for robbery of Pannella. He argues that the rule of

lenity applies because the convictions arose out of the same incident. The State concedes the issue.

In *Bellamy v. State*, 119 Md.App. 296, 705 A.2d 10 (1998), we examined whether a sentence for felony theft should be merged with a sentence for robbery with a deadly weapon. We noted that merger is evaluated under the "required evidence test," which provides:

> where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of fact which the other does not.

*Bellamy, supra,* 119 Md.App. at 305 n. 1, 705 A.2d 10 (quoting *Blockburger v. U.S.,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)). We concluded that the two offenses do not merge under the required evidence test because each crime contains elements separate and distinct from the other. Felony theft requires proof of a taking of property in excess of $300, and robbery with a deadly weapon requires proving use of force and a dangerous or deadly weapon. *Id.* at 306, 52 S.Ct. 180.

 Despite this, "even if the two offenses do not merge, there may be a merger of penalties based on the rule of lenity." *Id.* at 306, 52 S.Ct. 180 (citing *Spitzinger v. State,* 340 Md. 114, 124, 665 A.2d 685 (1995); *Gargliano v. State,* 334 Md. 428, 437, 639 A.2d 675 (1994); *White v. State,* 318 Md. 740, 744, 569 A.2d 1271 (1990); *Claggett v. State,* 108 Md.App. 32, 51–52, 670 A.2d 1002 (1996)). The rule of lenity mandates that the court evaluate whether the legislature intended cumulative or successive punishments, resolving any doubt or ambiguities in favor of the defendant. In *Bellamy*, when we applied the rule of lenity, we concluded that the sentence for the two crimes had to merge.

> We ... have some doubts, in light of our prior cases and the history of common law robbery and common law larceny, as to whether the legislature intended to authorize successive or cumulative punishment for felony theft and robbery. Those doubts must be resolved in favor of the defendant, so

that under the rule of lenity the sentences for robbery and felony theft should merge.

119 Md.App. at 307, 705 A.2d 10 (quoting *Spitzinger, supra,* 340 Md. at 124, 665 A.2d 685).

In the case at bar, like in *Bellamy,* the crimes of felony theft and robbery do not merge under the required evidence test. Felony theft requires proof of the taking of property in excess of $300 and robbery requires proof of the use of force, each elements not present in the other crime. Nevertheless, for the same reasons expressed in *Bellamy,* the rule of lenity dictates merging the sentence for felony theft. Both convictions were predicated on the taking of the same property from the same victim in a single incident. We cannot say that the legislature intended cumulative punishment in that circumstance; accordingly, the ambiguity must be resolved in the appellant's favor.

**SENTENCE FOR FELONY THEFT VACATED; JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY OTHERWISE AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANT.**