703 A.2d 1295

Michael J. PAPPACONSTANTINOU

v.

STATE of Maryland.

No. 361, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Jan. 6, 1998.

Tucker Clagett (Andrews, Schick, Bongar & Starkey, P.A., on the brief), Waldorf, for appellant

Regina Hollins Lewis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Leonard C. Collins, Jr., State's Atty. for Charles County, La Plata, on the brief), for appellee.

Argued before MOYLAN and SONNER, JJ., and ROSALYN B. BELL, Judge (retired), Specially Assigned.

SONNER, Judge.

On July 18, 1996, appellant, Michael J. Pappaconstantinou, also known as Michael J. Pappas, was indicted on twelve

counts of theft under $300 and one count of theft over $300 for stealing merchandise and money from his employer. On October 31, 1996, appellant was brought to trial before a jury in the Circuit Court for Charles County (Nalley, J). At the beginning of the trial, appellant moved to suppress statements he made to his former employer in which he confessed to the theft. The court held a hearing, outside of the jury's presence, and determined that the confession was admissible because there was no violation of Pappas's constitutional rights, and the circumstances surrounding the statement showed that the statement was not "inherently unreliable." The jury convicted appellant on all counts and the court sentenced him to a nine-month term of incarceration in the county jail. Appellant noted this appeal and argues that the trial court erred in admitting the confession because it was the product of threats and promises and, therefore, involuntary. We conclude that the trial court properly admitted the confession and, accordingly, affirm.

## STANDARD OF REVIEW

In examining the question presented, the record at the suppression hearing is the exclusive source of facts for our review. *Lee v. State,* 311 Md. 642, 648, 537 A.2d 235 (1988). We extend great deference to the suppression court's fact-finding, particularly that court's ability to "determin[e] the credibilities of contradicting witnesses and to weigh[ ] and determin[e] first-level facts." *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990). When conflicting evidence is presented, we accept the facts as found by the suppression court, unless clearly erroneous. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990). After giving due regard to the suppression court's findings of fact, we then make our own independent appraisal by reviewing the law and applying it to the facts of the case. *Aiken v. State,* 101 Md.App. 557, 563, 647 A.2d 1229 (1994).

## SUPPRESSION HEARING FACTS

Michael Pappas was employed by Auto Row Auto Parts (Auto Row) in Waldorf, Maryland for approximately three

years. In January 1996, Auto Row terminated Pappas when his employers suspected that he had been stealing from the company. Pappas then went to work for Pep Boys Auto Store and, as of the time of trial, Pappas was manager of Yates Auto Parts (Yates), also located in Waldorf.

On March 29, 1996, shortly after his termination from Auto Row, Pappas had a telephone conversation with employees of Auto Row to discuss allegations that Pappas learned his former employer had been making against him. Specifically, Pappas testified that he "heard on the street" that an Auto Row employee was "saying that I was a crook." The State contends that Pappas, upon hearing these allegations, initiated contact with Auto Row by paging Auto Row's sales manager, Len Gentilcore, on the afternoon of March 29, 1996. William Clark, another Auto Row employee, testified at the suppression hearing that he observed Len Gentilcore call Pappas immediately after Gentilcore received Pappas's page. According to Clark, Pappas told Gentilcore, "I understand I'm being prosecuted, what's going on, what do I need to do." Gentilcore told Pappas to "call Bill Clark." Clark testified that, approximately two minutes later, he received a phone call from Pappas. Pappas asked Clark, as he had asked Gentilcore, what, if anything, he could do with respect to the allegations against him. According to Clark:

> [Pappas] stated that I understand I'm being prosecuted, what do I have to do to stop this. We talked for a minute. Really caught me off guard, I told Mike [Pappas] that in my opinion you would have to do three things.
>
> * * * *
>
> [O]ne, make a monetary reimbursement back to the company for what he stole, [two], not to work in an auto parts store in the Waldorf area, and [three], write a confession of what he did because of all the grief he put everybody through at Auto Row . . .

Clark then testified that Pappas called yet again, and the two spoke for "twenty to thirty minutes." Clark stated:

[Pappas] called back. Said that if I did [those three things], was there any guarantee, how do I know if I would be prosecuted. I [Clark] said, my word is good ... I told him we need to meet tonight if we are going to do this. Consequently, he called back the third time and the meeting was set up.

Not surprisingly, Pappas presented a starkly different account of how the meeting between him and Clark was arranged. Pappas claimed that it was Auto Row's Len Gentilcore who made the initial phone call to Pappas. Pappas testified that "Len [Gentilcore] called me at work on the 29th" and said "you better do something, the dogs are after you, Brian [Puckett, Auto Row's owner] is playing golf with the State's Attorney, he will have all files as of Saturday." Pappas further testified, consistent with Clark's testimony, that Gentilcore told Pappas to call Clark. Pappas continued:

So I called [Clark] and I asked him. And he said, I don't know if Brian's playing golf with the State's Attorney. He said, To tell you the truth, being you don't have any money, it doesn't matter if they're playing tennis, whatever they say is what's going to happen. You don't have any money, you intend to go to settlement on your house Friday.

Later in his testimony, Pappas again stated that Clark referred to an upcoming meeting he was supposed to have with the State's Attorney. According to Pappas, Clark said, "[w]e're meeting with the State's Attorney on Saturday. Once the State's Attorney is involved, it doesn't matter what we say, it's the State [sic] now." Under cross-examination, however, Clark unequivocally denied saying anything about the State's Attorney:

[Defense Counsel]: Do you know anything about someone playing golf with the State's Attorney?

[Clark]: There was something Mike said about that.

[Defense Counsel]: There wasn't any mention that [Brian Puckett] was going to be playing golf with the State's Attorney?

[Clark]: No, sir. Mike called me.

Clark also denied another of Pappas's allegations, namely, that he threatened to have Pappas arrested on his wedding day.

Clark and Pappas agreed to meet that evening at Jaspers, a restaurant in Crofton, Maryland. Again, the stories regarding this meeting are markedly different. According to Clark, Pappas arrived at Jaspers at the agreed-upon time, accompanied by his then fiancee, Dawn Rae. Dawn Rae immediately went to the bar and remained there for the duration of Pappas's meeting, while Pappas went to the booth in which Clark and Len Gentilcore were seated.[1] At this point, according to Clark, Pappas sat down and

> apologized for what had happened and we had a conversation about those things that had took [sic] place at the store. He also talked about him getting married and I said that I wasn't aware. Just pleasantries.

Clark continued:

> [Pappas] said, What do I need to write and I said, What you did. And he started actually trying to handwrite.

Clark testified that Pappas wrote the confession on his own and, on cross-examination, denied dictating or otherwise directing Pappas.

> [Defense Counsel]: You didn't tell him what to write?
>
> [Clark]: Absolutely. No.
>
> \* \* \* \*
>
> [Defense Counsel]: Did Mike ever stop in the middle of writing and say, This doesn't sound right, and you said just write?
>
> [Clark]: No, sir . . .

Pappas's account of the meeting at Jaspers conflicts with Clark's account in almost every respect. First, Pappas testified that when he and Dawn Rae entered the restaurant, Clark told Pappas that Dawn Rae was not to be involved:

---

1. According to the record, a third Auto Row employee, Jim Puckett, joined Clark, Gentilcore, and Pappas later in the evening.

[Clark] said, this is between us, This is business, this is not concerning your wife. [Clark] goes, We will not talk about anything until she leaves.

Pappas then recounted his version of the rendering of the confession in the following colloquy on direct examination:

[Pappas]: [Clark] said I want you to write this statement saying that you weren't wrongfully fired and I think that was all he wanted in the statement. And I basically took dictation of what he said.

[Defense Counsel]: What do you mean you basically took dictation?

[Pappas]: I mean I signed my name myself, but I mean the wording of it is his.

[Defense Counsel]: What was your understanding you were getting in exchange for writing this statement?

[Pappas]: For writing this statement, he was going to drop all charges, if they even had any. I didn't know at the time. He didn't show me any paperwork. He was going to drop everything he had against me and move on. In his own words, I never want to hear your name again.

The handwritten confession, State's Exhibit # 1 at the suppression hearing, reads as follows:

I Michael John Pappas wrongfully took merchandise and money from Auto Row Auto parts. I realize that I was correctly terminated from this establishment. Property was destroyed and incorrectly marked as return item [sic]. I realize that what I did was wrong and I unjustly cause [sic] a lot of difficulties to the members of Auto Row Auto Parts.

The confession was dated March 29, 1996 and signed by Pappas and the three Auto Row representatives present at Jaspers.

The court concluded that Pappas's statement was not "inherently unreliable," and admitted it. Though the trial court did not specifically articulate the test that it used, the court apparently based its ruling on common law evidentiary princi-

ples. The court viewed Pappas's statement as an "admission," and noted the "general rule" that such statements are normally "inherently reliable because [the declarant] is putting himself in some kind of peril by admitting something." The court noted that, although threats and promises may cast doubt on the reliability of a statement, the circumstances of this case showed that the statement was freely given and, thus, constituted competent evidence for the jury's consideration.

[N]ot every admission that follows on the heels of a promise or even a threat necessarily is inherently unreliable. And I think this case fits that exception.

\* \* \* \*

[Pappas's statement] . . . was not the product of such promise or threat as to render it inherently unreliable . . . I am persuaded, at least by the preponderance standard, that whatever discussion was had about prosecution was in the context of defendant's having asked what can I do to get out of it, what can I do to avoid it.

The court emphasized that its decision turned, in large part, on the credibility of Clark and Pappas, respectively.

Mr. Pappas said in response to my question that it was he and not Len Gentilcore who initiated the conversation—the part of the conversation that had to do with prosecution . . . I conclude from this that, though [Pappas's] account and Clark's account vary substantially as to particulars, that meeting was as much the product of Mr. Pappas bringing up the topic of prosecution as it was Clark's or Gentilcore's.

### Analysis

■ Pappas's sole argument on appeal is that the trial court erred by not suppressing the confession he made to his former employer, Auto Row. In particular, Pappas claims that, because his "statement was made in light of [a] promise not to prosecute, it is 'involuntary' . . . and should have been inadmissible." Under Maryland law, a defendant's confession is admissible if it is:

(1) voluntary under Maryland nonconstitutional law [common law],

(2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution,[2] and

(3) elicited in conformance with the mandates of *Miranda.*

*Ringe v. State,* 94 Md.App. 614, 621, 618 A.2d 266 (1993); *see also Hoey v. State,* 311 Md. 473, 484, 536 A.2d 622 (1988).

■ Pappas does not and, indeed, could not argue that his confession was obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It is well settled that *Miranda* warnings need be given only when "an individual is taken into custody or otherwise deprived of his freedom *by the authorities* in any significant way and is subjected to questioning." *Id.* at 478, 86 S.Ct. at 1630. (emphasis added). In addition, "[w]here an accused's statements are elicited by persons other than police," official interrogation has been held to exist only "where the State is otherwise involved." *Hamilton v. State,* 62 Md.App. 603, 610, 490 A.2d 763 (1985). Pappas has conceded that the State was not involved in his confession, either directly or indirectly; he acknowledges that the representatives from Auto Row were private actors, and does not claim that Auto Row colluded with law enforcement officers in obtaining the statement from him.

Similarly, Pappas does not argue that admitting the confession violates his due process rights under the Fourteenth Amendment. Again, as he has conceded that there is no State action in this case, we agree that such an argument is foreclos-

---

**2.** As Judge Moylan noted in his thorough review of Maryland confession law in *Hof v. State,* 97 Md.App. 242, 250, 629 A.2d 1251 (1993), aff'd 337 Md. 581, 655 A.2d 370 (1995), although challenges to confessions may also be based on Article 22 (privilege against self-incrimination) or Article 23 (due process) of the Maryland Declaration of Rights, "[a]s a practical matter, those provisions are never used." Moreover, since the Maryland constitutional provisions have been interpreted *in pari materia* with their federal counterparts, challenges based on the Maryland provisions would succeed or fail precisely as they would under the federal provisions.

ed.  *See, e.g., Reynolds v. State,* 327 Md. 494, 504, 610 A.2d 782 (1992); *Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986).[3]

■ Rather, Pappas concedes that the only basis upon which his confession could possibly be suppressed is under Maryland's common law doctrine of voluntariness.  Under that doctrine, Pappas argues that his confession may not be used against him "unless it first be shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary." *Hillard v. State,* 286 Md. 145, 150, 406 A.2d 415 (1979).  Pappas further claims that "the government must shoulder the responsibility of showing affirmatively that the inculpatory statement was freely and voluntarily made and thus was the product of neither a promise nor a threat." *Hillard,* 286 Md. at 151, 406 A.2d 415.  For the reasons discussed below, we find the common law voluntariness test, at least as appellant has articulated it, inapplicable in cases in which a private party has elicited a confession, which is later offered and received in evidence in a criminal prosecution of the confessor.  Instead, we hold that privately-extracted confessions should be viewed like any other hearsay statement, such as a declaration against penal interest, and that the test, therefore, should be whether the statement is inherently trustworthy.  See *Powell v. State,* 85 Md.App. 330, 342–43, 583 A.2d 1114, 1120 (1991) (quoting *Brady v. State,* 226 Md. 422, 429, 174 A.2d 167 (1961)) ("To what extent a confession or admission . . . bears the indicia of trustworthiness [and is thus admissible] is a question which we think should be entrusted in the first instance to the sound discretion of the trial judge.")

At the outset, we note that appellant has not directed us to a single decision in which the common law voluntariness test,

---

**3.** In holding that coercive police activity is a necessary predicate to finding a confession involuntary under the due process clause of the United States Constitution, the Court noted that "[t]he most outrageous behavior by a private party seeking to secure evidence does not make that evidence inadmissible."  479 U.S. at 166, 107 S.Ct. at 521.

the test he asks us to follow, has been applied to a privately-extracted confession. Indeed, the cases upon which Pappas has relied, *Hillard, Kidd, Abbott,* and *Reynolds,* discussed *infra,* all involved state action. Consequently, the test that he urges this Court to adopt has been ripped from its proper context and presented as though it were a rule applied uniformly to all confessions. Nothing could be further from the truth. In *State v. Kidd,* 281 Md. 32, 35–36, 375 A.2d 1105 (1977), the Court stated that "[f]or a statement to be the free and voluntary act of an accused, it must be obtained without force applied, coercion used, hope held out or promise made *on the part of the authorities.*" (Emphasis added). In *Hillard v. State,* 286 Md. 145, 153, 406 A.2d 415 (1979), the Court found that the defendant's statement had been involuntarily obtained because "the *officer* had promised the defendant help if he would make a statement...." In *Abbott v. State,* 231 Md. 462, 463, 190 A.2d 797 (1963), the question before the Court was whether the defendant's confession "was induced by *threats of the police* to also charge [the defendant] with murder unless he confessed committing armed robbery...." (emphasis added). And finally, in *Reynolds v. State,* 327 Md. 494, 507, 610 A.2d 782 (1992), the Court explained:

> Maryland has followed the old common law rule, which has seemed to adopt a per se exclusion rule that *official* promises of leniency to a defendant in custody that induce a confession render the confession inadmissible. In a line of cases reaching back into the last century, this Court has explored challenges to the voluntariness of statements made by suspects who had been offered promises. If a confession "had been induced by any threat of harm, or promise of worldly advantage held out to him by [*the interrogating detective* ], or *by his authority,* or in his presence and *with his sanction,* it ought to be excluded." *Nicholson v. State,* 38 Md. 140, 153 (1873) (emphasis added).

We find it particularly significant that the *Reynolds* Court added the words, "the interrogating detective," to the quotation from *Nicholson,* ostensibly, to emphasize that the com-

mon law exclusionary rule has been applied only in cases of *governmental* overreaching.

In short, the fallacy of Pappas's argument is that, because the voluntariness test inheres in common law rather than the Constitution, it must necessarily apply to private actors. On the contrary, since its inception in *Nicholson v. State* in 1873, the common law voluntariness doctrine has been viewed as yet another element of the "superstructure of procedural safeguards" to protect individuals from having government-coerced confessions admitted against them. *Jacobs v. State,* 45 Md.App. 634, 654, 415 A.2d 590, 601 (1980) (citing *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)). It reflects the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will. . . ." *Jackson,* 378 U.S. at 386, 84 S.Ct. at 1785. We conclude that statements made to private individuals should not be viewed in the same light as statements made to government officials.

Instead, we believe the proper framework for analysis of this case was articulated by Judge Moylan in *Jacobs v. State,* 45 Md.App. 634, 415 A.2d 590 (1980). In *Jacobs,* three co-defendants were charged with murder. While awaiting trial in the Baltimore City Jail, two of the co-defendants were questioned by Harry Conyers, a social worker assistant at the jail and a notary public. This interrogation was apparently orchestrated at the behest of the third co-defendant's attorney. Conyers testified that he presented the two defendants with statements that had been typed in advance. The statements were full acknowledgments of guilt. The defendants signed the statements in Conyers's presence; the statements were notarized and admitted at trial. As in the case at bar, the defendants conceded that State action was not involved. Rather, the trial court based its ruling on the "common law of evidence." Finding that the statements were material, relevant, and competent, the trial court admitted the statements. *Id.* at 646–47, 415 A.2d 590.

On appeal, Judge Moylan, writing for the Court, noted initially that the challenged "confessions" made to private individuals were not confessions at all but, rather, declarations against interest. *Id.* at 643, 415 A.2d 590. He reasoned that "the very word 'confession' carries too much highly charged connotative baggage, with its images of police interrogation, of third-degree sessions under naked lightbulbs, of question and answer formats . . . ." *Id.*

Addressing the admissibility of the statements, Judge Moylan agreed with the trial court's analysis that the case turned on the "distinction between the common law of evidence and the constitutional law of evidence." *Id.* at 653, 415 A.2d 590.

> In essence, evidentiary law is a set of sieves and devices that pass through to the fact finder data that is competent, relevant, and material but screen out all data that is incompetent, irrelevant, and immaterial. The common law of evidence is interested fundamentally in the integrity of the fact-finding process . . . The prime concern is trustworthiness, the reliability, the accuracy of the process. . . .

> \* \* \* \*

> With respect to evidence procured by private persons, we ask the questions that are the concern of the common law of evidence: Is it competent?, Is it trustworthy?, Will it enhance the accuracy of the verdict?

*Id.* at 644–46, 415 A.2d 590.

The Court then addressed the issue of voluntariness and articulated a rule much different from the one that Pappas proposes in this case.

> There is a residual sense, of course, in which the jury will consider voluntariness. . . . Part of the jury's prerogative is to weigh all evidence and to decide how persuasive it is.

> \* \* \* \*

> In this regard, the assessment of the weight to be given a declaration against interest is no different from the assessment of the weight to be given any piece of evidence,

exception to the hearsay rule or otherwise. The jury may always ask, "Was the utterance truly spontaneous?"; "Was the admission ambiguous?"; "Was the declaration truly against interest?"; "Did the interest threatened outweigh the benefit to be gained?"

*Id.* at 656, 415 A.2d 590.

In support of its position that privately-extracted confessions—or, declarations against interest—are admissible, absent some indication that the statement is inherently unreliable, the *Jacobs* Court cited approvingly two cases, the facts of which are strikingly similar to the case at bar. In *Trinkle v. State,* 259 Ind. 114, 284 N.E.2d 816 (1972), the defendant challenged the admissibility of admissions or confessions made by him to the owner of the carpet he was in the process of stealing. Even though that court found that the statements were the product of "physical persuasion," *Id.* 284 N.E.2d at 817, it, nonetheless, found the statements admissible. It noted, 284 N.E.2d at 819:

> While the standard of voluntariness is necessary to prevent police abuse of defendants, the same policy does not exist in circumstances involving private citizens. The factor of control is not present. Where police may lock one up and impose burdens on an accused which necessitates [sic] protection, [private citizens] ... lack[ ] the leverage for abuse which the law enforcement officers possess.

Similarly, in *United States v. Biggerstaff,* 383 F.2d 675 (4th Cir.1967), the defendant, an assistant vice president of a bank, was taken to a motel room by several of the bank's officers who suspected that he had defrauded the bank. They interrogated him and threatened him with the loss of his job if he did not make a statement. The defendant confessed and, at trial, argued that the confession was involuntary. The Fourth Circuit affirmed the lower court's admission of the statement, holding that the conduct of the bank officers did not constitute "government coercion." *Id.* at 680.

In short, the gravamen of the *Jacobs* Court's decision is that confessions taken by private persons lack the element of

unseemliness that exists when the government extracts a confession and should, therefore, be examined like any other piece of evidence.  If the statement manifests sufficient indicia of reliability, then it should be admitted and the jury may accord the statement whatever weight it deems appropriate.

■ We conclude that the trial court properly applied that principle in deciding to admit Pappas's confession.  The trial court stated that "not every admission that follows on the heels of a promise or even a threat necessarily is inherently unreliable."  The court then looked at the particular circumstances surrounding Pappas's statement to determine whether the statement was inherently unreliable.  The court found, as a matter of fact, that it was Pappas, and not an Auto Row employee, who initiated the conversation concerning the allegations against him, and it was Pappas who asked what he could do to avoid those charges.  The court further found that "[the] meeting [at Jaspers] was as much the product of Mr. Pappas bringing up the topic of prosecution as it was Clark's or Gentilcore's," and ". . . that whatever discussion was had about prosecution was in the context of the defendant's having asked what can I do to get out of it, what can I do to avoid it." "And [Pappas] told me just now that he understood from the telephone conversation with Clark that among the things Clark was going to insist on . . . to avoid prosecution [was] an account, if you will, regarding what he had allegedly taken." The court concluded, therefore, that Pappas knew exactly what he was doing when he met with Clark and Gentilcore at Jaspers, that he gave the confession knowingly and voluntarily, and that the confession ". . . was not the product of such promise or threat as to render it inherently unreliable."  We agree and, accordingly, affirm.

**JUDGMENT AFFIRMED;  APPELLANT TO PAY COSTS.**