871 A.2d 647

David COX

v.

STATE of Maryland.

No. 0191, Sept. Term, 2003.

Court of Special Appeals of Maryland.

April 6, 2005.

Allison E. Pierce (Stephen E. Harris, Public Defender, on brief), for appellant.

Shannon E. Avery (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel HOLLANDER, KRAUSER, JAMES S. GETTY (Retired, Specially Assigned) JJ.

HOLLANDER, J.

David Cox, appellant, proceeded to trial before the Circuit Court for Baltimore City (Prevas, J.), sitting without a jury, and was convicted of possession with intent to distribute heroin and possession of heroin. After merging the two offenses, the court sentenced appellant to four years' incarceration for the felony drug offense.

On appeal, Cox presents one question for our review:

Did the trial court err in denying appellant's motion to suppress?

For the reasons that follow, we shall affirm.

## FACTUAL BACKGROUND[1]

### The Suppression Hearing

On October 2, 2001, Baltimore City Police Officer Maxwell Anderson was in uniform and on patrol in an unmarked police vehicle, accompanied by Officer Chris Tims. As a member of the City's police force for more than fifte

---

1. The suppression hearing was held on January 22, 2003. When we review the denial of a motion to suppress, we look only to the record of the suppression hearing. *Cartnail v. State*, 359 Md. 272, 282, 753 A.2d 519 (2000); *Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491 (1999). Therefore, in view of the single issue presented, we need not recount the evidence adduced at trial.

years, Anderson was received as an expert in narcotics investigation.

Anderson testified that, late in the morning on October 2, 2001, he saw appellant standing with other individuals on the corner of Federal and Wolfe streets in Baltimore City, an area "known for heroin sales." Anderson spoke to Cox "in reference to being on that corner, why are you there, you have to go, that type of thing."

About forty minutes later, at approximately noon, Officer Anderson was driving "in the area of Federal and Wolfe," with Officer Tims as a passenger. As they were proceeding eastbound in the 1900 block of Federal Street, Anderson saw appellant "riding a BMX styled bicycle," heading eastbound on the same street. Appellant "glanced over his shoulder" at the officers and "appeared nervous[.]" Then, appellant "sped up on the bike," turned south onto Chapel Street,[2] and headed west onto Oliver Street. On Oliver Street, appellant "slowed up" and "kept glancing over his shoulder" at the officers. From Oliver Street, Cox turned north onto Wolfe Street. By that point, Cox had made three right turns, and appeared to be making a "square."

When appellant turned onto Chapel Street and then onto Oliver Street, Officer Anderson lost sight of him briefly. The officer explained: "When I say lost sight, I'm talking about momentarily. Like a second. He turned the corner, then I'm around the corner. I could actually still see him at that point."

Anderson noted that Wolfe Street is a one-way street in the southbound direction, and appellant "was riding against traffic on Wolfe Street ... cars were coming southbound." Anderson considered "highly suspicious" appellant's conduct of riding the wrong way on Wolfe Street. In an effort to follow Cox, Anderson turned onto Wolfe Street, driving "the wrong way on a one-way street."

---

2. In the record, Chapel Street is spelled Chappel and Chapel.

When Cox was "half way up the block" on Wolfe Street, he "cut" between two parked vehicles, made a "U-turn," and went onto the sidewalk. According to Officer Anderson, while appellant made the U-turn, he (Cox) took his right hand off the handle bars of his bicycle and reached into his right front pocket. As appellant made this maneuver "in the middle of a turn," he "lost his balance" and had to stop his bicycle by putting his foot down "momentarily."

Anderson pulled up to the space between the parked cars, through which appellant had just ridden his bicycle. Anderson estimated that he was seven yards from appellant at that point.

While appellant was stopped, Anderson saw appellant remove from his front pocket a clear plastic bag that contained "numerous small gel caps." Officer Anderson recalled: "They were clear, containing a white powder I knew to be, based upon my training, to be heroin. Suspected heroin, at least." Anderson also testified: "When [appellant] stopped, reached into his pocket and pulled out what I could see to be drugs, at that point he was told to stop." However, Anderson maintained that he had not asserted his authority as a police officer prior to that point.

Officer Anderson also stated that, at the "moment" that appellant was removing the drugs from his pocket, Officer Tims "was getting out of the car and was going right towards [appellant]." Officer Tims then "grabbed a hold" of appellant and "seized him along with the bag." Tims "subsequently handcuffed" appellant and placed him "under arrest."

The officers recovered the plastic bag that appellant had removed from his pocket; it contained 24 gel caps. Officer Anderson described that bag as being knotted at the top and about an inch and a half in size, which could fit in appellant's hand.

Appellant was also searched incident to his arrest. During the search, the officers recovered another plastic bag containing "25 small clear gel caps with white powder suspected to be

heroin similar to the ones in the other bag," [3] and $790 in U.S. currency. Officer Anderson opined that the heroin was "for street level distribution." The officer added that, while being searched, appellant stated: "[I]t's only 50 pills. So, if I get you a gun, what can be done?"

Officer Anderson denied that he called out, "David, come here." Moreover, he maintained that he did not instruct appellant to stop until after he saw appellant remove the drugs from his pocket. Officer Anderson agreed, however, that the Statement of Charges, which he wrote, stated: "Police Officer Tims asked Mr. Cox to stop so we could talk to him. Instead, Mr. Cox tried to make an abrupt U-turn on the bicycle at the same time trying to discard a plastic bag."

Officer Tims testified that, while the officers were following appellant, they lost sight of him for "[n]ot more than a second or two" as he turned each corner. According to Officer Tims, appellant "kept looking back over his shoulder, peddling fast, looking over his shoulder peddling faster."

According to Officer Tims, he was still in the police car, about ten feet from appellant, when he told Cox to stop. He directed appellant to stop when he (Cox) "attempted to do a u-turn to pull the bike up on the sidewalk and was attempting to discard the drugs." Tims exited the police car when he saw appellant "pulling drugs out of his pocket." Tims explained: "I could see that they were drugs and I took him to the ground."

According to Officer Tims, appellant committed a "whole multitude" of traffic violations, including failure to signal and riding the wrong way on a one-way street. Therefore, the officer wanted to conduct a field interview of appellant and issue a traffic citation. The following exchange is relevant:

COURT: All right, Officer Tims, on the occasion that gave rise to this complaint number on October 2, 2001, about

---

**3.** At the trial on January 23, 2003, the State introduced the chemical analysis of the items seized from appellant. That analysis indicated that all 49 gel caps contained heroin.

noon in the street, just in front of Oliver, did you ever give any command, either verbally or non-verbally—when I say you, I mean you and/or Anderson—to the defendant before you did the instructions?

[TIMS]: I believe I said could I speak to you a second.

COURT: What was your basis for saying that?

[TIMS]: Just when he appeared to be fleeing from us.

COURT: What was it about fleeing that caused you to assert your authority as a policeman?

[TIMS]: Just the area. I know that's in a high drug area. When people flee from you, there is usually a reason for it. I believe the court has upheld that people fleeing in a high drug traffic area is probable cause for a field interview. And at that time, I believe *I was going to conduct a field interview when he saw us and issue a traffic violation for traveling the wrong way on a one-way street.*

COURT: Had the traffic violation already occurred at the time you gave the command?

[TIMS]: Yes, sir. . . .

(Emphasis added).

In addition, Officer Tims said: "[I]t wasn't until after he committed the traffic violation, traveling the wrong way on a one-way street, that we went behind him." Notably, Tims stated: "Had [appellant] not committed any traffic violations or didn't try to flee from us, we might have driven right on by him."

Officer Tims claimed that, in his twelve-year career, he had ticketed bicyclists "[t]hree or four" times for traveling the wrong way on a one-way street. He acknowledged, however, that he never issued a traffic citation to Cox. Tims explained that "the drug offense supersedes the traffic violation so I believed there was no need for [the citation]." He added: "I could have gave him a warning. It is the officer's discretion on traffic cases."

Appellant testified in his own defense. He stated that, on the date in question, he was stopped by Officers Maxwell and

Tims while he was on foot in the 1900 block of East Lanvale Street. The officers checked his identification, asked why he was in the area, and told him "to go home." Appellant also stated that he consented to the officers' search of him, and claimed he had no drugs in his possession at that time.

Approximately forty-five minutes later, while appellant was riding his bicycle on Federal Street, he again saw the officers. When appellant turned onto Chappel Street, he noticed that the officers were "directly behind" him. Appellant turned right from Chapel Street onto Oliver Street and, from Oliver Street, appellant then turned right onto Wolfe Street, where he rode his bicycle on the sidewalk. Appellant denied riding his bike the wrong way on a one-way street. Appellant added that he did not realize the officers were following him until he made his third turn. He claimed that he only glanced over his shoulder once, and he denied speeding up at any point.

Further, Cox testified that, as he rode on the sidewalk, Officer Tims directed him to stop, stating: "David, stop." Appellant continued to ride his bike, however, so Officer Tims got out of the vehicle, "pushed" him off of his bicycle, "grabbed" him, and "searched" him. Appellant admitted that he had two bags of drugs in his pocket, but denied reaching into his pocket and pulling one out. To the contrary, he claimed that the bags were still in his pocket when he was detained. According to appellant, Officer Tims removed the bags from Cox's pocket, without Cox's permission.

At the close of the evidence, the defense challenged the officers' credibility, disputing their claim that they told Cox to stop once the drugs were visible to them. Cox's lawyer suggested that it was not plausible that appellant would have tried to discard the drugs, knowing the officers were following him. Further, the defense argued that, merely because appellant was on a bicycle and continued on his way, without stopping, that did not give rise to a justifiable "basis for the stop." Cox claimed that he had "a constitutional right to continue going."

In particular, appellant's lawyer argued:

[E]ven under the version that he's riding the wrong way, that doesn't allow the police to arrest him. It would only allow them to give him a ticket. Even under that farce that they have created here, that these officers are going to give him a ticket because he's riding the wrong way, Mr. Cox told you he was on the sidewalk. Even if you believe the officers that he was on the street at that time, that doesn't justify a search of Mr. Cox's person. The court would still have to find that Mr. Cox who is still trying to discard drugs, as the police would have you believe, reached into his pocket. And it is very interesting how this officer testified.... Does that make any sense?

He doesn't discard [the drugs], your honor, when the police are 25 to 30 yards away, he waits until the police get within several feet of him and now he discards it like this. Is that credible testimony, your honor?

The State contended, in part, that appellant was not "seized" until he was in custody, after the officers saw him with narcotics in his hand. The prosecutor also claimed that the officers had probable cause for Cox's arrest upon seeing him with the drugs.

The trial court denied appellant's motion to suppress. It said, in part:

I find the testimony of [O]fficer Tims to be credible. Officer Anderson almost covers what Tims covers, but he falters in a few respects. And defendant almost covers what Tims covers, but he falters in a few respects. But, I think that the version of the seizure by the officer who focused on the seizure, Tims, is the most credible.

\* \* \*

The bottom line is that, as Tims indicated in this particular case, that the defendant was riding on a bicycle. Tims recognized him from an earlier encounter, but that, alone, wasn't dispositive of the issue. Apparently Anderson didn't. What got Tims' attention was the fact that defendant glanced over his shoulder, began to speed up and made four right-hand turns going around in a circle, and while that

peeked [sic] the officer's curiosity, they kept their distance of 25 to 30 yards and followed the defendant to see what would happen next. And what happened next is the defendant committed a transportation code violation by going northbound on Wolfe [S]treet against the one-way southbound and at that time, Tims believed that, under the double ambit of him being able to write a citation for a transportation code violation, which he does once every three years, but does do, and because he thought the person was fleeing under *Illinois v. Wardlow*[, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000),]—he didn't use those words, but when he said the law allows us to stop and interview people who are fleeing, I believe he was indicating he had reasonable suspicion to detain the person long enough to find out who he was and what he was doing.

As a result of that, [Tims] issues the command to stop at an interesting moment. I mean, he can issue the command to stop just to write the citation, but he picks an interesting moment. At that moment that he does it, defendant is trying to cut from the street between two parked cars onto sidewalk, make a u-turn with the bike and discard items from his pocket.

I'll give the defendant the benefit of the doubt that either the word stop was said first or that the item was concealed in his hand at the time that the word stop was uttered because there was such reasonable suspicion for Tims to tell him to stop absent seeing the controlled dangerous substances.

But the defendant didn't succeed in discarding the controlled dangerous substances in a way that escaped the police's attention, that at some point the substance was visible in his hand and that the *Terry* stop initiated by Tims at the moment that he said stop ripened into probable cause for arrest because, once the drugs were more visible, it was clear both to Tims and Anderson that what they were seeing was the defendant discarding drugs. I find that this was not a forced abandonment because, in order for there to be a forced abandonment, there had to be no justification

for the *Terry* stop and the individual had to have disgorged the evidence as a result of police misconduct.

## DISCUSSION

### A.

Appellant contends that the trial court erred in denying his motion to suppress, because the officers lacked reasonable, articulable suspicion to conduct an investigatory stop. Among other things, appellant argues that the drugs were not yet visible when Officer Tims told Cox to stop, and Officer Tims's belief that Cox was fleeing was insufficient to support an investigatory stop. Moreover, appellant asserts: "The trial court's finding that the officers saw Appellant attempting to discard a plastic bag containing heroin was clearly erroneous."

The State counters that the police had ample basis to make an investigatory stop. It maintains that the stop was justified because the police saw Cox riding his bicycle in the wrong direction on a one-way street. In addition to the traffic violation, the State points to Cox's nervous behavior, his evasive conduct, and his presence in an area known for drug trafficking.

In any event, the State maintains that the "police did not effect an investigatory stop of Cox, because—assuming the police ordered him to stop—he did not comply." And, because "Cox did not submit to the authority of the police," the State insists that there was no seizure. In addition, the State argues: "[W]ithin moments," the police observed, "in plain view," a clear baggie in Cox's hand, which contained suspected drugs. At that point, asserts the State, the police had "probable cause to effect an arrest."

In our review of the court's ruling, we extend great deference to the court's findings of fact and determinations of credibility. *McMillian v. State,* 325 Md. 272, 281–82, 600 A.2d 430 (1992); *Charity v. State,* 132 Md.App. 598, 606, 753 A.2d 556, *cert. denied,* 360 Md. 487, 759 A.2d 231 (2000). We accept the facts as found by the suppression court, unless clearly

erroneous. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990). In addition, we review the evidence in the light most favorable to the State as the prevailing party. *Wilkes v. State,* 364 Md. 554, 569, 774 A.2d 420 (2001). "After giving due regard to the suppression court's findings of fact, we then make our own independent appraisal by reviewing the law and applying it to the facts of the case." *Pappaconstantinou v. State,* 118 Md.App. 668, 670, 703 A.2d 1295, *aff'd,* 352 Md. 167, 721 A.2d 241 (1998); *see Ornelas v. United States,* 517 U.S. 690, 696–97, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *Cartnail v. State,* 359 Md. 272, 282–83, 753 A.2d 519 (2000).

## B.

The Fourth Amendment protects against unreasonable searches and seizures. *United States v. Mendenhall,* 446 U.S. 544, 551, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). A traffic stop involving a motorist is a detention that implicates the Fourth Amendment. *See United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *State v. Green,* 375 Md. 595, 609, 826 A.2d 486 (2003); *Rowe v. State,* 363 Md. 424, 432, 769 A.2d 879 (2001); *Ferris v. State,* 355 Md. 356, 369, 735 A.2d 491 (1999); *Edwards v. State,* 143 Md.App. 155, 164, 792 A.2d 1197 (2002).

Nevertheless, "[t]he Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (citing *Illinois v. Rodriguez,* 497 U.S. 177, 183, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)); *see United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Rosenberg v. State,* 129 Md.App. 221, 239, 741 A.2d 533 (1999), *cert. denied,* 358 Md. 382, 749 A.2d 173 (2000). Therefore, if the police have probable cause to believe that a driver has committed a traffic violation, a stop of the driver generally does not violate the Constitution. *See Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Ferris,* 355 Md. at 369, 735 A.2d 491 (noting that a traffic stop does not "initially

violate the federal Constitution if the police have probable cause to believe that the driver has committed a traffic violation"). The police officer may detain the driver temporarily " 'to enforce the laws of the roadway, and ... to investigate the manner of driving with intent to issue a citation or warning.' " *Green*, 375 Md. at 609, 826 A.2d 486 (citation omitted). But, the detention of a person during the traffic stop must be "temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); *see Ferris*, 355 Md. at 369, 735 A.2d 491.

Probable cause has been defined as "a non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction but more evidence than ... mere suspicion." *Doering v. State*, 313 Md. 384, 403, 545 A.2d 1281 (1988); *see also Maryland v. Pringle*, 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (reiterating that "the probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts...."); *State v. Lee*, 330 Md. 320, 326, 624 A.2d 492 (1993) defining probable cause as a " 'fair probability that contraband or evidence of a crime will be found in a particular place.' " (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

As the Supreme Court said in *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), "[i]n dealing with probable cause, ... as the very name implies, we deal with probabilities." Moreover, probable cause is evaluated by considering the totality of the circumstances of a given situation. *Collins v. State*, 322 Md. 675, 679, 589 A.2d 479 (1991); *Howard v. State*, 112 Md.App. 148, 684 A.2d 491 (1996), *cert. denied*, 344 Md. 718, 690 A.2d 524 (1997). And, of particular relevance here, the Supreme Court recently said in *Devenpeck v. Alford*, —— U.S. ——, 125 S.Ct.

588, 593, 160 L.Ed.2d 537 (2004): "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."

In the seminal case of *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that police officers may also stop persons to investigate possible criminal activity even without probable cause. But, a valid investigatory stop requires that "the police have specific articulable facts which, taken together with rational inferences from those facts, create reasonable suspicion that the person has been or is about to be involved in criminal conduct." *Aguilar v. State,* 88 Md.App. 276, 281, 594 A.2d 1167 (1991); *see Derricott v. State,* 327 Md. 582, 587, 611 A.2d 592 (1992) (stating that police officer may stop a suspect "if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot"); *Smith v. State,* 161 Md.App. 461, 870 A.2d 1228 (2005) (same).

"[R]easonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). The Supreme Court has described reasonable suspicion as " 'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Ornelas, supra,* 517 U.S. at 696, 116 S.Ct. 1657 (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Moreover, we must consider the totality of the circumstances in determining whether the police had reasonable, articulable suspicion to effect an investigatory stop. *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); *White,* 496 U.S. at 330, 110 S.Ct. 2412.

■ Thus, even without probable cause to stop a vehicle, it is clear that the police may effect a lawful stop of a motorist, so long as the officer is " 'able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *Ferris,* 355 Md. at 384, 735 A.2d 491 (citations omitted). In *Rowe v. State,* 363 Md. at 433, 769 A.2d 879, the Court of Appeals explained:

A traffic stop may also be constitutionally permissible where the officer has a reasonable belief that "criminal activity is afoot." Whether probable cause or a reasonable articulable suspicion exists to justify a stop depends on the totality of the circumstances. Thus, the Supreme Court has held that the Fourth Amendment is violated:

"[W]here there is neither probable cause to believe nor reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable laws."

(quoting *Delaware v. Prouse,* 440 U.S. 648, 650, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)) (internal citations omitted). *See also Edwards v. State,* 143 Md.App. 155, 165, 792 A.2d 1197 (2002) (recognizing that "a lawful traffic stop may rest upon reasonable, articulable suspicion"); *Pryor v. State,* 122 Md.App. 671, 679, 716 A.2d 338 ("It is well settled . . . that the forcible stop of a motorist may be based on reasonable articulable suspicion that is insufficient to establish probable cause."), *cert. denied,* 352 Md. 312, 721 A.2d 990 (1998).

■ We are satisfied that the police made a lawful investigatory stop of Cox.[4] While appellant was in a known

---

4. Although we are satisfied that the investigatory stop was lawful, we need not determine whether a frisk would have been valid if the officers had not seen appellant discarding the drugs. We are mindful of what this Court reiterated in *Pryor v. State,* 122 Md.App. 671, 679, 716 A.2d 338, *cert. denied,* 352 Md. 312, 721 A.2d 990 (1998): " 'While there undoubtedly is some risk to the police in every confrontation, *Terry* has never been thought to authorize a protective frisk on the occasion of

drug area, he repeatedly glanced over his shoulder at the officers as he began traveling faster and faster on his bicycle. He also appeared nervous and made repeated turns, as if he were trying to elude the officers. And, he turned onto Wolfe Street, where he rode in the wrong direction on a one-way street. A person's flight and nervousness, along with his presence in a high crime area, are factors that are relevant to the issue of reasonable, articulable suspicion. *See Wardlow,* 528 U.S. at 124–25, 120 S.Ct. 673 (consideration may be given to the nature of the area and the individual's unprovoked flight from police in determining if reasonable articulable suspicion was present); *Anderson v. State,* 282 Md. 701, 707 n. 5, 387 A.2d 281 (1978) ("Factors deemed relevant to a determination of reasonable suspicion to stop include the character of the area where the stop occurs, the temporal or spatial proximity of the stop to a crime, and the appearance or conduct of the suspect."); *Whiting v. State,* 125 Md.App. 404, 417, 725 A.2d 623 (1999) (noting that an officer's experience with drug trafficking, and his familiarity with an area known for drug trafficking activity, may be considered when assessing probable cause); *Grant v. State,* 55 Md.App. 1, 21, 461 A.2d 524 (1983) (noting that, in determining reasonableness of seizure, the Supreme Court has considered the characteristics of the area and the behavior of suspect). *But see Ferris,* 355 Md. at 389, 735 A.2d 491 (noting that "the statement that an individual appeared unusually nervous is an extremely subjective evaluation," and cautioning "against according too much weight to the State's routine claim that garden variety nervousness accurately indicates complicity in criminal activity").

Alternatively, we are satisfied that the police made a lawful traffic stop. We explain.

As noted, appellant rode his bicycle northbound on Wolfe Street, a one-way southbound street. In *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Supreme Court explained: "As a general matter,

every authorized stop.' " (quoting *Simpler v. State,* 318 Md. 311, 321, 568 A.2d 22 (1990)).

the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."[5]   The Court concluded that the constitutional reasonableness of traffic stops does not depend on the actual motivations of the officers involved; "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* at 813, 116 S.Ct. 1769.

In *Devenpeck, supra,* 125 S.Ct. 588, the Supreme Court underscored the vitality of *Whren.*   Citing *Whren,* 517 U.S. at 812–13, 116 S.Ct. 1769, it said, *id.* at 593, 116 S.Ct. 1769: "Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."   The Supreme Court added that an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck,* 125 S.Ct. at 594.   Put another way, "the legal justification" offered "for the officer's action does not invalidate the action taken so long as the circumstances, viewed objectively, justify that action." *Id.* (quotations and citations omitted).

Traffic stops founded upon probable cause, but motivated by considerations other than the traffic infraction, have become known as *"Whren* stops."   Addressing *Whren,* we said in *Pryor v. State, supra,* 122 Md.App. at 679, 716 A.2d 338: "Under *Whren,* the law enforcement officer who observes a traffic violation may stop the violator, even though the officer does so out of curiosity as to whether (or in the hope that) the stop will lead to the discovery of other incriminating evidence."   Similarly, we explained in *Whitehead v. State,* 116 Md.App. 497, 500, 698 A.2d 1115, *cert. denied,* 348 Md. 207, 703 A.2d 148 (1997): "In *Whren,* . . . the Supreme Court held that, as long as the police *could* have stopped the driver for a traffic violation, it is inconsequential that the police actually

---

**5.** For a recent discussion that is largely critical of *Whren, see* Wayne R. LaFave, *The "Routine Traffic Stop" From Start to Finish: Too Much "Routine," Not Enough Fourth Amendment,* 102 Mich. L.Rev. 1843 (2004).

stopped the driver to investigate another offense." (Emphasis in original; citation omitted).

■ Here, the police officers saw appellant violate the traffic law by riding his bicycle in the wrong direction on a one-way street. Although appellant urges us to limit an officer's right to make a traffic stop to the motor vehicle context, he fails to offer any reason why a police officer may not stop a bicyclist who is observed committing a violation of applicable transportation laws. Indeed, he overlooks § 21–1202 of the Transportation Article ("Tr.") of the Maryland Code (1974, 2002 Repl.Vol.), titled: "Traffic laws apply to bicycles and motor scooters." Tr. § 21–1202 provides, in part, that a person operating a bicycle "is subject to all the duties required of the driver of a vehicle by this title. . . ." In addition, he ignores Tr. § 21–308(a)(2), which provides: "On a roadway designated and signposted for one-way traffic, a vehicle may be driven only in the direction designated." *See also Billings v. Shaw,* 247 Md. 335, 336, 231 A.2d 12 (1967) ("The motor vehicle laws as to the rules of the road apply to a cyclist. . . .") (Citations omitted); *Kane v. Williams,* 229 Md. 59, 61, 181 A.2d 651 (1962) (noting that "the motor vehicle laws pertaining to the rules of the road and traffic control devices and signals are as applicable to a cyclist as they are to the driver of a motor vehicle . . ."); *Gazvoda v. McCaslin,* 36 Md.App. 604, 608, 375 A.2d 570 (1977) ("A bicycle is a vehicle . . ." for purposes of the "boulevard rule," which requires the unfavored driver to yield the right of way); *Richards v. Goff,* 26 Md.App. 344, 354, 338 A.2d 80 (1975) ("A bicycle is a vehicle." A cyclist who rode bike out of a "blind" driveway was negligent for failing to stop and yield right of way to motorist.); *Oddis v. Greene,* 11 Md.App. 153, 155–56 n. 3, 273 A.2d 232 (1971) (stating that the boulevard rule "is not limited in its application to motor vehicles; it applies to bicycles.")

Other jurisdictions have applied *Whren* in the context of a traffic stop of a bicyclist. In *United States v. Bell,* 86 F.3d 820 (8th Cir.1996), for example, the defendant was seen riding his bicycle at night, without a headlamp, in a known high-

crime area, in violation of Iowa law. The officers knew the suspect was a gang member who had been arrested for possession of cocaine base, and that bicycles were used by gangs in the area to transport drugs. *Id.* at 822. Therefore, the officers arrested the defendant for the traffic offense, and recovered cocaine base from him. The defendant sought to suppress the drugs, claiming the traffic stop "was merely a pretext to investigate drug activity." *Id.*

The Eighth Circuit upheld the search. It said:

Although a pretextual traffic stop violates the Fourth Amendment, any traffic violation, even a minor one, gives an officer probable cause to stop the violator. If the officer has probable cause to stop the violator, the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant.

*Id.* (citations omitted). The court added: "The officer's suspicion that Bell was involved in drug activity does not affect the stop's objective reasonableness." *Id.*

*State v. Flowers*, 880 So.2d 887, 889 (La.Ct.App.2004), is also pertinent. There, the officers observed a bicyclist who rode in the middle of the road in an erratic and swerving manner, failed to keep his hands on the handlebars, and appeared to be intoxicated. Applicable traffic regulations required cyclists to ride on the right side of the road. Upon stopping the cyclist, the officers saw him drop an object, which turned out to be crack cocaine. *Id.* at 888. The defendant challenged the legality of the stop. Relying on *Whren*, the Louisiana court concluded that the officers lawfully effected the stop after observing the traffic infraction, even if the stop was merely a pretext to investigate for drugs. *Id.* at 889.

Here, Officers Tims and Anderson made a valid traffic stop. They observed appellant violate Tr. § 21–308(a)(2), because he was riding the wrong way on a one-way street. Therefore, the officers had probable cause to effect a stop of appellant based on that traffic violation. To the extent that the officers may also have suspected that appellant was involved with drugs, and were motivated to effect the traffic stop for that reason,

their suspicions and motivations were irrelevant with regard to the analysis of the legality of the stop.

## C.

Appellant also challenges the legality of his arrest. According to Cox, regardless of the validity of the *Terry* stop, if he "never removed the drugs from his pocket, there was no probable cause for the arrest that followed on the heels of the officers' *Terry* stop." In this regard, Cox attacks the credibility of the officers' testimony that they observed him remove from his pocket a plastic bag containing heroin. He asserts that the trial court was clearly erroneous when it made the factual finding that "at some point the substance was visible in [Appellant's] hands."

To attack the officers' credibility, appellant draws our attention to the discrepancies in their testimonies: Officer Anderson indicated that he told appellant to stop only after he saw the bag of drugs in appellant's hand, while Officer Tims stated that he told appellant to stop before he saw appellant with the drugs. Further, Cox alleges that testimony from the officers that he did not attempt to discard the drugs until they were within a short distance of him strains credulity. This is so, he claims, because the officers briefly lost sight of him as he turned the corners, thereby giving him an opportunity to discard the drugs. Therefore, he alleges that there would have been no reason for him to wait until the officers were close to him before discarding the drugs. Finally, appellant refers us to his testimony that he never removed the drugs from his pocket. Thus, he contends that the trial court was clearly erroneous in finding that the officers observed him remove the bag of drugs from his pocket after they issued their command to stop.

The court below was aware of the discrepancies in the testimonies of Officer Anderson and appellant, but it expressly credited the testimony of Officer Tims. As we noted earlier, an appellate court must give due regard to the trial court's "opportunity to assess the credibility of the witnesses."

*McMillian v. State,* 325 Md. 272, 282, 600 A.2d 430 (1992). *See In re Tariq A–R–Y,* 347 Md. 484, 488, 701 A.2d 691 (1997) ("In considering the evidence presented at the suppression hearing, we extend great deference to the fact-finding of the suppression hearing judge with respect to determining the credibility of witnesses . . . ."); *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990)("When the facts are in dispute, we accept them as found by the trial judge unless he is clearly erroneous in his judgment on the evidence before him. In ascertaining whether he is clearly erroneous, we give 'due regard to the opportunity of the trial court to judge the credibility of the witnesses,' as commanded by Md. Rule 8–131(c)"). Moreover, "we view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion . . . ." *State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439 (2003).

We are satisfied that the trial court was not clearly erroneous in finding that Officers Tims and Anderson saw the bag of drugs in appellant's hand. Once the officers saw the drugs in appellant's hand, they had probable cause to arrest him.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**